Charles Harvey ODOM, Petitioner,

v.

E. V. NASH, Warden, Respondent.

No. 14828-2.

United States District Court
W. D. Missouri, W. D.

Feb. 27, 1964.

Anthony P. Nugent, Jr., Kansas City, Mo., Stephen M. Boyd and Charles Edson, St. Louis, Mo., for petitioner.

Thomas F. Eagleton, Howard McFadden, Jefferson City, Mo., for respondent.

GIBSON, Chief Judge.

Petitioner, an inmate in state custody at the Missouri State Penitentiary, was found guilty on a charge of forcible rape, and sentenced to death by a jury in the Circuit Court of Jasper County, Missouri, on November 9, 1961. Petitioner has exhausted his state remedies as required by § 2254, Title 28, U.S.C., and now files in forma pauperis a petition for habeas corpus and a motion for a stay of execution. In light of the facts and circumstances alleged, and in view of the fact that petitioner is scheduled to be executed on March 6, 1964, this Court issued an order to show cause, and a hearing was held before this Court in Kansas City, Missouri, on February 20, 1964, at which petitioner was represented by counsel, although petitioner himself was not present. The Court offered to secure petitioner's presence at this hearing by issuing a Writ of Habeas Corpus ad Testificandum, but petitioner's counsel stated petitioner's presence was not desired and that they could present their issues fully without petitioner's presence.

Petitioner seeks to be discharged from custody on the grounds that due to the inflammatory press coverage which the case received before trial, petitioner was deprived of his right to a trial by a fair and impartial jury, and that the refusal of the Circuit Court of Jasper County, to grant the motion for a change of venue to Lawrence County, a county contiguous to Jasper County, operated to deprive petitioner of his right to a fair and impartial tribunal.

The facts surrounding petitioner's arrest and subsequent conviction briefly are these. A 13-year-old girl, Lisa Schuh, was abducted, raped, and severely beaten, and as a result of this attack her brain was damaged and she suffered a partial paralysis of her right side. Petitioner was arrested and identified as the attacker. The news media in the Joplin area afforded extensive coverage to the event, and carried stories that petitioner had been arrested, gave information as to petitioner's prior record, and also carried the story that petitioner had confessed to the crime. A fund drive, denominated as the Lisa Schuh Fund, was begun, and contributions were received from many residents of the Joplin area.

Two prominent attorneys were appointed for petitioner, and prior to trial

they filed a motion for change of venue on behalf of the petitioner, which was denied after a hearing, (R. 5–147), and subsequently renewed that motion after the voir dire. The motion was again refused. (R. 416). At trial considerable evidence was introduced implicating petitioner as the attacker, and this evidence included the confessions of petitioner. Petitioner's defense was not guilty by reason of insanity, and no contention was seriously made at trial that petitioner did not in fact perpetrate the crime. (R. 685, 712, 713). Primarily most of the efforts of petitioner's attorneys were directed towards mitigation of penalty in an attempt to obtain a sentence less than the death sentence for petitioner. (R. 685, 712, 713). After the jury was instructed, they deliberated 40 minutes before returning a verdict of guilty and assessing petitioner's punishment at death.

■ Petitioner contends that under the case of Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), that the failure of the trial court to grant a change of venue prior to voir dire constituted a deprivation of due process. In the Rideau case, a bank was robbed and a man was killed during the holdup. A few hours after the holdup and slaying, Rideau was arrested, and confined in the Calcasieu Parish jail. The following morning Rideau was interrogated by the sheriff of the parish in the parish jail, and during the course of this interrogation Rideau confessed to the robbery and killing. The whole course of the interrogation was filmed and a sound track made, and a few hours later this film and sound track were telecast over the local television station. This telecast was repeated on two succeeding days, and reached well over one-third of Calcasieu Parish's 150,000 inhabitants. Two lawyers were appointed for Rideau and at arraignment, they made a motion for a change of venue which was denied after a hearing. At trial it was determined that at least three of the jurors had seen the telecast and that two others were deputy sheriffs.

Although Rideau's attorneys requested that these jurors be excused for cause, this request was refused. Rideau was convicted of murder and was sentenced to death. The Supreme Court held that under the circumstances of the case that it was a denial of due process not to grant the motion for change of venue and further held that it was not necessary in this case that the change of venue should have been granted prior to the voir dire examination. The Court stated, 373 U.S. l. c. 726, 727, 83 S.Ct. l. c. 1419, 10 L.Ed.2d 663:

> "Under our Constitution's guarantee of due process, a person accused of committing a crime is vouchsafed basic minimal rights. Among these are the right to counsel, the right to plead not guilty, and the right to be tried in a courtroom presided over by a judge. Yet in this case the people of Calcasieu Parish saw and heard, not once but three times, a 'trial' of Rideau in a jail, presided over by a sheriff, where there was no lawyer to advise Rideau of his right to stand mute."

This Court is convinced that the Rideau case is not the present case, and that this case is not governed by Rideau. Although there was extensive press and television coverage, that coverage amounted only to a narration of the events. It did not show petitioner making his confession nor was any publicity directed to petitioner's competence or incompetence, the only actual defense advanced by petitioner.

■ Petitioner also contends that the case of Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1960), would require that after the voir dire examination had been conducted, the change of venue should have been granted due to the prejudice and lack of impartiality of the jurors. In Irvin, the situation was one in which the defendant was arrested and tried for murder. There had been six murders in the area, and the case had received widespread publicity. Irvin's attorneys requested and received a change of venue to Gibson County, Il·

linois, but then made another motion for change of venue on the basis that the prejudice present in the original county had permeated Gibson County. This second motion for change of venue was denied. Of the total panel called many were excused, and of the final twelve selected, eight professed an opinion that the defendant was guilty, some of these stating that it would take evidence to the contrary to overcome their belief of defendant's guilt. Another juror stated that he could not give the defendant the benefit of the presumption of innocence. The Supreme Court held that under those circumstances, the failure to grant the change of venue deprived the defendant of due process.

Petitioner points out that at least two of the jurors who sat in this case had an opinion, although it is not set out whether the opinion was one of guilt or innocence. Those two jurors are juror Greninger and juror Allman. Petitioner states that juror Greninger stated that he had an opinion (R. 343) and that juror Allman also stated that he had an opinion. (R. 343). (But this last Record citation is erroneous as Allman does not appear on that page.) In answer to this it should be pointed out that juror Greninger apparently misunderstood the question on R. 343 as when asked by the defense if he had an opinion stated, R. 349, 350:

A. "I have not."
Q. "You have no opinion."
A. "I have no opinion."

Also juror Greninger did not equivocate in stating that he could arrive at "a fair and true verdict in this case." (R. 304). Juror Allman stated that he had an opinion at page 267 of the Record, but his answer to the question by petitioner's counsel of whether or not it would require evidence to change his opinion was:

A. "No. I realize that this law is based upon the defendant being innocent until proven guilty and I could hear the evidence and decide right there without any regard of what I had read.

Q. "Now, do you feel that you'd carry any of that opinion that you had before into the juryroom with you after—to deliberate, do you feel that you could do it solely on what you hear here? I know it's hard, I—.
A. "I know I could.
Q. "You definitely could?
A. "Yes."

Juror Allman's answers apparently satisfied the defense as he was not challenged either for cause or peremptorily.

As pointed out by petitioner, there were some jurors who, in answer to the question of whether they felt they could render a fair and impartial verdict based solely on the evidence, gave equivocal answers such as "I believe that I could.", or "I feel that I could." These jurors were C. L. Mayo (R. 169), E. L. Kohley (R. 172), F. C. Osborn (R. 190), H. M. Moss (R. 193), and J. W. Brown (R. 314). All of these jurors subsequently, upon examination by the defense, gave unequivocal affirmative answers. Further in closing argument, counsel for petitioner expressed their satisfaction with the members of the jury in these words, R. 711:

"And, when we picked you as twelve to sit, after asking you those questions and the answers that you gave back to me and the conversation that we had, we reached the conclusion that of all the people in Jasper County, we felt that you twelve, as mature gentlemen who had seen life and knew something about life, would be qualified and that you had not made up your minds or else you wouldn't be on this jury panel."

and also stated, R. 720:

"You are the twelve people that completely satisfied both the State and the defense as being men with reason, men who were capable of understanding the situation, understanding the facts, understanding all of the facets of this case in reaching

a decision which would be fair and a decision which would be just."

In light of the evidence presented at the hearing on the motion for change of venue, the answers given on the voir dire examination, and the expressions of approval given by counsel for the defense as to the jury panel, this Court is satisfied that the petitioner was not denied his right to a fair tribunal and a fair and impartial jury.

A review of the Record amply demonstrates that the trial judge was meticulous in securing petitioner's rights, that extensive interrogation was had and encouraged of the voir dire veniremen, the Court allowed defendant's counsel almost unlimited examination of the prospective jurors about every phase and facet of the case that could be of any possible benefit to defendant. Any who expressed any doubt about according the petitioner a fair and impartial trial and according him the presumption of innocence were excused from the voir dire panel, as were those who admitted any bias or impartiality. One of the built-in safeguards in the state of Missouri for securing a fair and impartial jury is not only that the jurors are drawn by lot from a jury wheel but the voir dire panel is composed of thirty jurors from which the defendant in a criminal case has twelve peremptory strikes and the state has six, § 546.180 RSMo 1959, V.A.M.S. The whole Record discloses that a fair and impartial voir dire panel of thirty jurors were sworn to sit in the case and the petitioner, of course, made twelve strikes from this panel. It is significant to note that none of the members of the jury panel who heard the case were challenged for cause by the petitioner and as previously stated, defendant's counsel expressed approval of the jury panel.

█ It, of course, would be unrealistic to contend that the facts of this case were not inflammatory as they occurred in the undenied narrative of events constituting the offense. Such brutal mistreatment of an innocent child of 13 years of age would naturally cause resentment in the minds of any normal person. But,

the jurors called, including those excused, exhibited no feeling of bias or prejudice against the defendant as such, although some expressed feelings on the hideousness of the offense. In other words, there was no condition approaching mob violence nor was there any general condition of bias or prejudice against the defendant as a member of any particular race or group as there has been in some of the cases cited by petitioner. On the whole the panel exhibited a sincere desire to approach the matter in an open-minded fashion, to view and weigh the evidence and render a verdict solely on the evidence adduced in the case and under the instructions of law given by the Court. The petitioner himself set the forum for the trial in his selection of the locale of the offense and should not now be heard to complain that because of the viciousness and brutality of his own admitted acts that he should be accorded a different forum, unless, of course, under the law a fair and impartial trial could not be held. This he has not demonstrated and in fact the Record convincingly shows that he was accorded a fair and impartial trial by a jury selected in accordance with the laws of the state of Missouri and under the usual procedures followed in the state of Missouri to insure a fair and impartial jury.

█ In view of the heinousness of the crime and the fact that there was no real issue before the jury other than the issue of what was the proper punishment to assess, forty minutes of deliberation certainly is sufficient time in which to fully discuss the evidence and arrive at a conclusion. Further, as noted by the Missouri Supreme Court in its review of petitioner's trial, State v. Odom, 369 S.W.2d 173 (1963), the case received such widespread publicity that it was as fully reported throughout the state as it was in Jasper County, and a change of venue to Lawrence County would not have diminished the possibility of jurors being exposed to news coverage. The news stories printed and broadcast were narrative and factual. They were not col-

ored to cause prejudice. The complaint about the Lisa Schuh Fund is unfounded, as the Fund was solely to aid the unfortunate victim and was not an anti-Odom fund to prosecute the defendant. (R. 22, 58). The jurors were interrogated at length on this matter and no member of the jury had actually contributed personally to such Fund, although possibly the wife of one juror had made some contribution, which fact even if true would not be such as to ipso facto render him ineligible as a juror, as the juror specifically stated that he was not prejudiced and could render a fair and impartial verdict based solely on the evidence adduced.

After a full scrutiny of all of the proceedings, it is apparent that the state proceedings were fair and adequate, and that the Record fairly supports the findings of the trial court in regard to the denial of the change of venue, therefore the Court is convinced that the standards laid down in Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) have been met, and that the files and records conclusively show that petitioner is not entitled to relief on the basis that he was refused a fair and impartial jury and tribunal.

■ Petitioner also avers that it was error for the state not to provide the petitioner with a psychiatric examination. This issue was not argued at the hearing held in this cause, and it is the opinion of the Court that petitioner has failed to meet his burden of proof on that issue.

■ The Court has noted in its reading of the record that page 622 of the transcript on appeal to the Missouri Supreme Court is missing. After reading closely the pages of the transcript both preceding and following the missing page 622, the Court is of the opinion that the omission of the page in question caused no prejudice to the petitioner.

For the foregoing reasons the petition for habeas corpus is denied.

It is so ordered.